IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

KATHY I. FRANKLIN,
    Plaintiff,

v.                                                                    Case No: 5:09cv76/SPM/MD

MICHAEL J. ASTRUE,
Commissioner of Social Security,
    Defendant.
_____

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Rules 72.1(A), 72.2(D) and 72.3 of the local rules of this court relating to review of administrative determinations under the Social Security Act and related statutes. It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying claimant Franklin's application for disability insurance benefits and Supplemental Security Income benefits under Titles II and XVI of the Act.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

## PROCEDURAL HISTORY

Ms. Franklin filed applications for benefits claiming an onset of disability as of May 30, 2002. The applications were denied initially and on reconsideration, and

plaintiff requested a hearing before an administrative law judge (ALJ). A hearing was held on February 11, 2008 at which Ms. Franklin was represented by counsel and testified. A vocational expert also testified. The ALJ entered an unfavorable decision (tr.17-25) and Ms. Franklin requested review by the Appeals Council without submitting additional evidence. The Appeals Council declined review (tr. 6-8). The Commissioner has therefore made a final decision, and the matter is subject to review in this court. *Ingram v. Comm'r of Soc. Sec. Admin*, 496 F.3d 1253, 1262 (11th Cir. 2007); *Falge v. Apfel*, 150 F.3d 1320 (11th Cir. 1998). This timely appeal followed.

## FINDINGS OF THE ALJ

Relative to the issues raised in this appeal, the ALJ found that Ms. Franklin met the insured status requirements of the Act through June 30, 2006; that she had not engaged in substantial gainful activity since May 30, 2002; that she had severe impairments of (1) degenerative disc disease in the cervical and lumbar spine, (2) mood disorder due to general medical condition, and (3) personality disorder, but that she did not have a condition or combination of conditions that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; that she had the residual functional capacity to perform light work limited only to occasional climbing of ladders and stairs, balancing, stooping, bending, crouching, crawling or kneeling with a sit/stand option every 30 minutes; that she was capable of performing her past relevant work as a waitress, insurance agent, and office manager; and that she was not disabled as defined under the Act.

## STANDARD OF REVIEW

In Social Security appeals, this court must review de novo the legal principles upon which the Commissioner's decision is based. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (citing *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)). There is no presumption that the Commissioner followed the appropriate

legal standards in deciding a claim for benefits, or that the legal conclusions reached were valid. *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996); *Lewis v. Barnhart*, 285 F.3d 1329, 1330 (11th Cir. 2002). Failure to either apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal. *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1260 (11th Cir. 2007).

The court must also determine whether the ALJ's decision is supported by substantial evidence. *Moore*, 405 F.3d at 1211 (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158-59 (11th Cir. 2004)). Even if the proof preponderates against the Commissioner's decision, if supported by substantial evidence, it must be affirmed. *Ingram*, 496 F.3d at 1260; *Miles*, 84 F.3d at 1400. Substantial evidence is more than a scintilla but less than a preponderance, and encompasses such relevant evidence as a reasonable person would accept as adequate to support a conclusion. *Moore*, 405 F.3d at 1211 (citation omitted). In determining whether substantial evidence exists, the court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Secretary's decision. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). This limited review precludes deciding the facts anew, making credibility determinations, or re-weighing the evidence. *Moore*, 405 F.3d at 1211 (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir.1983); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). Findings of fact of the Commissioner that are supported by substantial evidence are conclusive. 42 U.S.C. § 405(g); *Ingram*, 496 F.3d at 1260.

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his

age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The social security regulations establish a five-step evaluation process to analyze claims for both SSI and disability insurance benefits. *See Moore,* 405 F.3d at 1211; 20 C.F.R. § 416.920 (2009) (five-step determination for SSI); 20 C.F.R. § 404.1520 (2009) (five-step determination for DIB). A finding of disability or no disability at any step renders further evaluation unnecessary. See 20 C.F.R. § 416.920; 20 C.F.R. § 404.1520. The steps are:

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe physical or mental impairment that meets the duration requirement?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 to subpart P of 20 C.F.R. Part 404 and meet the duration requirement?

4. Considering the individual's residual functional capacity, can the individual perform past relevant work?

5. Can the individual perform other work given the individual's residual functional capacity, age, education and work experience?

(Id.)

These regulations place a very heavy burden on the claimant to demonstrate both a qualifying impairment or disability and an inability to perform past relevant work. *Moore,* 405 F.3d at 1211 (citing *Spencer v. Heckler,* 765 F.2d 1090, 1093 (11th Cir.1985)). If the claimant establishes such an impairment, the burden shifts to the Commissioner at step 5 to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001); *Allen v. Bowen,* 816 F.2d 600, 601 (11th Cir. 1987). If the Commissioner carries this burden, claimant must prove that she cannot

perform the work suggested by the Commissioner. *Doughty,* 245 F.3d at 1278 n.2; *Hale v. Bowen,* 831 F.2d 1007, 1011 (11th Cir. 1987).

## PLAINTIFF'S MEDICAL HISTORY

As noted above, Ms. Franklin's claimed onset date was May 30, 2002. The first medical record after that date shows that on July 27, 2002 she went to the Calhoun Liberty Hospital complaining of pain in her right arm with some numbness from an old cervical spine injury. She was treated in the emergency room with medication and released (tr. 489-493). The next record of any medical treatment was on December 10, 2004, two and one-half years later, when she went to a clinic complaining of migraine headaches, low back pain, anxiety, hypertension and bipolar disorder. She was given medication and released (tr. 470). The record shows that from December 2004 through January 2008 Ms. Franklin was treated regularly at the North Florida Medical Clinic by Dr. Obesso and Dr. Mendez. During that time she made 40 visits, generally monthly. She had various complaints, including the usual medical problems, but also including complaints of pain and anxiety. She was treated conservatively throughout that entire time (tr. 263-319, 445-470).

On April 14, 2005 Ms. Franklin saw Hulon Crayton, M.D. on self referral. She reported that over the previous three years her arms had been numb and tingly. She had been depressed since 1995. She also had migraine headaches with associated abdominal pain and blurred vision of the right eye, along with anxiety, and problems with concentration and memory. She had lower bowel problems but a colonoscopy showed no evidence of inflammatory bowel. She also indicated that she had been on disability from 2001 to March 2002. She said she had been before the judge several times and stated that she could not get disability without a definitive

*Case No: 5:09cv76/SPM/MD*

diagnosis. On physical examination she was a well-developed, well nourished female in no acute distress. Her vital signs were normal, her neck was supple, her extremities showed no abnormalities and she had full range of motion at all joints without swelling. The fibromyalgia trigger point exam was positive. Dr. Crayton's assessment was fibromyalgia, most likely a consequence of depression. He suggested she see a psychiatrist because the relationship between depression and pain were intertwined (tr. 430-431).

Ms. Franklin went to the Life Management Center for psychological and psychiatric assistance. Her first visit was on June 6, 2005. She complained of multiple medical problems including elevated blood pressure, gastroesophageal reflux, migraine headaches and a spastic colon. She indicated she had a new diagnosis of fibromyalgia and was seeking disability. She said physical pain prevented her from working and wanted help for her depression. The intake counselor indicated that she should be seen by a psychiatrist (tr. 423-430). Ms. Franklin was regularly seen at the Life Management Center from that time through December 12, 2007. There were 13 visits in all, mostly to a nurse practitioner, Stephen Chesser, who prescribed medication. Ms. Franklin was seen by a psychiatrist several times, the first on July 27, 2005, John F. Mason, M.D. She told Dr. Mason that "they" had stopped her disability and she had lost Medicaid as a consequence, that her husband was disabled, and that she was reapplying for disability. Dr. Mason's diagnosis was mood disorder secondary to general medical condition, those being fibromyalgia, hypertension, muscle spasms, GERD and migraines. He prescribed Trazadone (tr. 420). Ms. Franklin next saw Dr. Mason six months later, on January 11, 2006. His diagnosis was the same and she was kept on Trazadone. Under progress notes Dr. Mason noted that Ms. Franklin was disheveled/unkempt, hyper verbal, cooperative, depressed, not anxious and not suicidal. Her mood and affect, anxiety, quality and content, perception, sensorium and cognitive functions were within normal limits. There was no risk of suicide and

no pronounced deviation in her character structure. Dr. Mason also noted that "they" finally diagnosed her with fibromyalgia and that she had pain trailing around her neck, back, leg, and colon because she had been misdiagnosed all those years (tr. 417-419). Ms. Franklin saw Dr. Mason again on October 4, 2006, unchanged. On November 15, 2006 her diagnosis was unchanged (tr. 340-342).

Along with Dr. Mason, Ms. Franklin was consistently followed by ARNP Stephen Chesser for medical progress. The first global assessment of functioning (GAF) he recorded was $50^1$ on October 4, 2006. The GAF began improving in January 2007 and beginning in April 2007 was consistently a $65^2$ (tr. 320-356). Finally, on January 23, 2008, shortly before the ALJ's hearing, ARNP Chesser filled out a Medical Source Statement of Ability to do Work-Related Activities (Mental). He opined that Ms. Franklin had extreme limitations in her ability to maintain attention and concentration for extended periods of time, and marked limitations in understanding, remembering, and carrying out detailed instructions, in her ability to respond appropriately to supervision, co-workers and work pressures in a work setting, and in her ability to manage household personal expenses and respond appropriately to normal pressures of daily living. Finally, Mr. Chesser indicated that Ms. Franklin would be absent from work on average more than three times a month and that these mental limitations applied during the period of November 2006 to the date of the assessment, January 23, 2008 (tr. 188-190).

In addition to Ms. Franklin's treatment at the Life Management Center, she was examined by George Horvat, Ph.D., a psychologist, on October 13, 2005 at the request of the Office of Disability Determination. Dr. Horvat noted that Ms. Franklin

---

[1] A GAF of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."

[2] A GAF of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."

*Case No: 5:09cv76/SPM/MD*

had a pending SSI claim. His notes reflected that she drove herself to the interview and appeared to be a reliable informant. Her chief complaints were depression and anxiety along with physical problems of high blood pressure, fibromyalgia, GERD, sleep problems, migraines, neck and back pain with radiation, and a spastic colon. She told Dr. Horvat that she spent most of her time in bed because of pain and always stayed home. She ate once a day, her energy was very low, and she cried spontaneously. The littlest things could set her off. On mental status examination she was alert, neat and evidenced no signs of physical impairment. Her posture and gait were normal and her motor activity was not remarkable. There was no impairment noted in attention and concentration but her memory was slightly defective. Eye contact was normal but her facial expression was depressed. She was cooperative, her rate of speech was normal, and content of her speech and thought were relevant and coherent. She said that she had once decided to kill herself but they took her to the emergency room. Two of her sisters had committed suicide. She appeared to be of average intelligence based on verbal skills and her fund of knowledge also seemed to be average. Her abstraction was concrete, her judgment was normal. She was realistic, she used corrections and her decision making appeared to be normal. Her main stressor was her illness and her coping ability seemed to be overwhelmed. Dr. Horvat's diagnosis was pain disorder, panic disorder with agoraphobia and major depressive disorder, recurrent. He opined that if she could physically return to work, there were no psychological reasons why she could not do so once the agoraphobia had been treated (tr. 414-416).

      On June 12, 2006, Ms. Franklin was referred to Douglas Stringer, M.D., a neurosurgeon, for evaluation. She gave a history of being involved in a motor vehicle accident a month earlier. She did not initially seek treatment but over the next two or three days began having pain in her neck and shoulders, thoracic area and low back with some numbness in her legs. She complained of neck pain, thoracic pain, left arm pain and numbness. She reported she previously had

difficulty with neck and back pain but mainly on the right side. Her pain was a seven on a scale of one to ten, worse with activity. On physical examination Ms. Franklin's vital signs were normal. She complained of marked tenderness in the mid and lower cervical spine and left shoulder with marked muscle spasm. There was limitation of neck movement to 50% of normal and Spurling's test caused pain in her neck and both arms. On neurological examination she gave details of her illness well and there was no apparent receptive or expressive speech problem. Neurological and motor examinations were normal although sensory examination showed spotty loss of sensation to pinprick over both arms. Her reflexes were normal and she walked with a limp. Dr. Stringer recommended MRIs of the cervical and thoracic spine with x-rays and an electromyographic (EMG) and nerve conduction (NCV) study of her arms (tr. 256-258). An MRI of the cervical spine taken the next day showed no interval change with no acute process and only mild degenerative changes at several levels (tr. 255). A cervical spine x-ray was read as normal (tr. 254). A thoracic spine MRI disclosed no acute process, mild degenerative changes and possible minimal chronic depression deformity at T-7. The NCV/EMG report disclosed normal nerve conduction in the arms but abnormal muscle activity indicative of posterior primary rami nerve root irritation (tr. 249). During the following months, Dr. Stringer treated Ms. Franklin conservatively as well as performing cervical epidural steroid injections on several occasions with nerve blocks (tr. 230-248). By November 17, 2006, Dr. Stringer noted that Ms. Franklin's neck was better, her pain intensity now being three out of ten, although there was some neck spasm. His impression at that time was status post motor vehicle accident in May 2006, neck pain with no evidence of cervical cord or root compression, significantly improved following cervical injections, and low back pain with some occasional pain involving her right leg but no clinical or radiographic evidence of lumbar nerve root compression or Cauda Equina compression (tr. 224-229).

Beginning in 2007, Ms. Franklin's low back problem became more acute and Dr. Stringer again performed nerve blocks and injections in the low back. By May 2, 2007, Dr. Stringer noted that Ms. Franklin was doing much better and that her pain was three out of ten versus nine out of ten as previously reported (tr. 205-207). He nevertheless continued giving her nerve blocks and injections through August 21, 2007. At his last office visit Dr. Stringer noted that Ms. Franklin's back pain overall had gone from a ten to a three but that she still had some pain involving her lower back, and some pain in her sacroiliac joints and right leg but without numbness or weakness (tr. 196-198).

## DISCUSSION

Ms. Franklin argues that the ALJ erred in failing to consider her fibromyalgia and occipital neuralgia and in rejecting the opinion of a mental health nurse, and that she was disabled from her onset date. The Commissioner argues that the ALJ's findings were supported by substantial evidence and must, therefore, be sustained. The issue thus presented is whether the ALJ's decision that Ms. Franklin was not disabled, in light of her physical and mental condition, age, education, work experience, and residual functional capacity, is supported by substantial evidence in the record.

1. <u>Fibromyalgia and Occipital Neuralgia.</u>

Ms. Franklin's first ground for relief is based on her claims that she had fibromyalgia and occipital neuralgia which the ALJ failed to find severe. She contends that this error occurred at step two, in the ALJ's residual functional capacity determination, in her finding on Ms. Franklin's credibility, and in the step four determination.

At step two the ALJ must determine whether the claimant has a severe impairment. 20 C.F.R. § 1520(c). The burden at this step is on the claimant. *Chester v. Bowen, supra.* The Commissioner's regulations provide:

> **What we mean by an impairment(s) that is not severe.**
>
> **(a) Non-severe impairment(s).** An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.
> **(b) Basic work activities.** When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include--
> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

**20 C.F.R. § 404.1521. The Commissioner has adopted an interpretive ruling that specifically addresses how to determine whether medical impairments are severe. The ruling provides in part:**

> **As explained in 20 C.F.R. §§ 404.1520, 404.1521, 416.920(c), and 416.921, at the second step of sequential evaluation it must be determined whether medical evidence establishes an impairment or combination of impairments "of such severity" as to be the basis of a finding of inability to engage in any SGA [substantial gainful activity]. An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made at this step when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities). Thus, even if an individual were of advanced age, had minimal education, and a limited work experience, an impairment found to be not severe would not prevent him or her from engaging in SGA.**

**SSR 85-28, 1985 WL 56856.**

In *Brady v. Heckler*, 724 F.2d. 914 (11th Cir. 1984) the Eleventh Circuit used the test later adopted in SSR 85-28 to state that a claimant's abnormalities must be of such kind that they would not be expected to interfere with the individual's ability to work. The Eleventh Circuit has further explained that

> **[s]tep two is a threshold inquiry. It allows only claims based on the most trivial impairments to be rejected. The claimant's burden at step two is mild. An impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience. Claimant need show only that her impairment is not so slight and its effect is not so minimal.**

*McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986). It is not for the reviewing court to say that under these circumstances plaintiff's impairment is or is not trivial, only that the ALJ must properly justify his finding on that issue. And the ALJ's findings must be supported by substantial evidence.

Ms. Franklin argues that the ALJ completely overlooked her "principal impairment" of fibromyalgia, such that every finding after step two was adversely affected and essentially rendered meaningless (doc. 19, p. 13). A thorough review of the record does not support this contention. The diagnosis of fibromyalgia is based largely on the patient's subjective complaints, and positive laboratory findings are simply unavailable. The disease has been recognized by The American College of Rheumatology as both real and difficult to confirm:

> Fibromyalgia is especially confusing and often misunderstood because almost all its symptoms are also common in other conditions. . . . Unfortunately, because certain symptoms lack physical and laboratory findings (signs), but depend mostly on a person's report of complaints and feelings (symptoms), these syndromes are often viewed as not being real or important.

Arthritis Foundation & American College of Rheumatology, <u>Arthritis *Information: Fibromyalgia*</u> (1992). The American College of Rheumatology has developed diagnostic criteria for fibromyalgia. A person can be affirmatively diagnosed with


the condition if he or she has widespread pain in combination with tenderness in at least 11 of 18 specific tender point sites. *See* National Institute of Arthritis and Musculoskeletal and Skin Diseases, *Questions and Answers About Fibromyalgia* (1999), available at http://www.niams.nih.gov/hi/topics/fibromyalgia/fibrofs.htm. The Seventh Circuit has held that requiring positive laboratory findings in cases of this nature is error. *Sarchet v. Chater*, 78 F.3d 305 (7th Cir. 1996) (ALJ erred in finding claimant non-disabled because of lack of positive laboratory tests) (cited approvingly in *Stewart v. Apfel*, 245 F.3d 793 (11th Cir. 2001) (table), 2000 U.S. App. LEXIS 33214 (unpublished opinion)[3]). In *Stewart*, the Court reviewed medical research on fibromyalgia, noting that it often lacks medical or laboratory signs, is generally diagnosed mostly on an individual's described symptoms, and its hallmark is a lack of objective evidence. Thus, the ALJ's determination that a fibromyalgia claimant's testimony was incredible, based on the lack of objective evidence documenting the impairment, was reversed. *Stewart,* 245 F.3d 793, 2000 U.S.App. LEXIS 33214, at *9, n. 4. More recently, the Eleventh Circuit addressed fibromyalgia in *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005), where it reiterated the impropriety of focusing on the absence of objective findings corroborating claims of the impairment. Other Circuits that have considered the issue have found that fibromyalgia is a disease that can serve as the basis for a medically determinable impairment, even without positive laboratory findings. *See, e.g., Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998) ("Fibromyalgia, which is pain in the fibrous connective tissue components of muscles, tendons, ligaments, and other white connective tissues, can be disabling."); *Preston v. Secretary of Health & Human Services*, 854 F.2d 815, 817-18 (6th Cir. 1988) ("Fibrositis [now fibromyalgia] causes severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances," and diagnosis involves testing for focal tender points.) Indeed, the Commissioner has instructed that in cases of chronic fatigue syndrome, a

---

[3] Unpublished decisions of this court are not binding precedent. See 11th Cir. R. 36–2.

*Case No: 5:09cv76/SPM/MD*

condition that, like fibromyalgia, is based largely on self-reported symptoms, "[p]ersistent, reproducible muscle tenderness on repeated examinations, including the presence of positive tender points" is an example of a medical sign that establishes the existence of a medically determinable impairment. Social Security Ruling 99-2p, 1999 WL 271569 (1999).

At one of Ms. Franklin's earliest recorded medical appointments she told Dr. Crayton that she needed a fibromyalgia diagnosis for her disability claim. Dr. Crayton's recorded physical examination was entirely normal, but he noted that the fibromyalgia trigger point exam was positive. He concluded that Ms. Franklin had fibromyalgia "[m]ost likely as a consequence of depression." (Tr. 431). However, there the trail ends. It is true that Ms. Franklin reported to Dr. Stringer that she had fibromyalgia ((tr. 246) and he included it in his diagnosis once in the first month after he saw her (tr. 244), but on that occasion he referred to trigger points without directly associating them with fibromyalgia. Dr. Stringer's notes did not refer to fibromyalgia in Ms. Franklin's subsequent examinations over the ensuing year when he was dealing with specific cervical and lumbar problems with injections and blocks, which were generally very helpful. Thus, whatever his first impression may have been, a diagnosis of fibromyalgia was abandoned early on. The record simply does not show "[p]ersistent, reproducible muscle tenderness on repeated examinations, including the presence of positive tender points" such as to establish the existence of a medically determinable impairment. SSR 99-2p, 1999 WL 271569 (1999)

Moreover, Ms. Franklin herself did not claim fibromyalgia as a disabling condition, testifying instead that she received injections for pinched nerves (tr. 520), and she did not refer to fibromyalgia at any time during her testimony (tr, 516-29). Accordingly, there was no error by the ALJ's failure to consider Ms. Franklin's claimed fibromyalgia condition.

The same is true concerning her claim that the ALJ ignored her occipital headaches. Such headaches are in the back of the head, but nowhere does the record show that they were any worse than or different in effect from headaches she complained of generally. At the hearing Ms. Franklin described her headaches as migraine (tr. 525-26), which the ALJ noted (tr. 22). As Ms. Franklin argues, a June 2005 EMG showed irritation of the posterior primary nerve root (tr. 249), but Ms. Franklin received multiple cervical blocks and injections. Dr. Stringer never directly associated the EMG findings with any specific symptom, he ordered the EMG because of Ms. Franklin's neck pain (tr. 256), and performed the injection therapy for the same reasons. Ms. Franklin's conclusion that occipital headaches were a factor in her treatment is not supported by the record.

2.  <u>Mental Health Nurse.</u>

Ms. Franklin also contends that the ALJ erred in rejecting the opinion of the mental health nurse, Mr. Chesser. There was no error. As the ALJ pointed out, Mr. Chesser's opinion was not consistent with his own notes. He reported that Ms. Franklin had some mental deficiencies, notably mood disorder secondary to he general medical condition. The GAF scores assigned, particularly during the last year of treatment, were almost consistently 65, meaning some mild symptoms but generally functioning well. DSM-IV-TR p. 34. This is completely inconsistent with Mr. Chesser's opinion that Ms. Franklin was markedly limited in nearly all of life's activities.

Also, Mr. Chesser was not a physician. Title 20 C.F.R. § 404.1513 lists the medical sources that are "acceptable" for purposes of proving disability. The list includes licensed physicians, osteopaths, psychologists and similar certified professionals. 20 C.F.R. § 404.1513(a). The Commissioner will also consider medical reports, 20 C.F.R. § 404.1513(b),(c),(d). Finally, the Commissioner will consider "information from other sources" which may help understand how an

impairment affects the ability to work, 20 C.F.R. § 1513(e). Listed under "other sources" are "nurse-practitioners." *Id.* The Eleventh Circuit has held that an ALJ is permitted to accord less weight to chiropractors and other nonmedical doctors, than to medical doctors, *Falge v. Apfel*, 150 F.3d 1320 (11th Cir. 1998), and that a chiropractor's opinion "cannot establish the existence of an impairment." *Crawford v. Commissioner*, 363 F.3d 1155, 1160 (11th Cir. 2004). Chiropractors are listed under the same "other sources" section as nurse practitioners like Mr. Chesser. The ALJ did not err in discounting Mr. Chesser's opinions, and Ms. Franklin is not entitled to reversal.

Accordingly, it is respectfully RECOMMENDED that the decision of the Commissioner be AFFIRMED, that this action be DISMISSED and that the clerk be directed to close the file.

At Pensacola, Florida this 8th day of April, 2010.

/s/ *Miles Davis*
     **MILES DAVIS**
     **UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. See 28 U.S.C. § 636;** *United States v. Roberts*, **858 F.2d 698, 701 (11th Cir. 1988).**

*Case No: 5:09cv76/SPM/MD*